UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KATHY L. BERRY,

    Plaintiff,

v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

Case No. 1:10-cv-435

Spiegel, J.
Bowman, M.J.

**REPORT AND RECOMMENDATION**

Plaintiff, Kathy Berry filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents essentially three claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

**I. Summary of Administrative Record**

On August 29, 2002, Plaintiff filed an application for Disability Insurance Benefits (DIB), alleging a disability onset date of March 1, 2002, due to knee, hip, and left arm pain.[1] (Tr. 64-67, 84). Plaintiff was born on January 10, 1956 and was 46 years old at the time of the onset of her alleged disability. After Plaintiff's claims were denied initially and upon reconsideration, (Tr. 38-48), she requested a hearing *de novo* before an Administrative Law

---

[1] Plaintiff filed a prior application for DIB in June 1993, and was awarded a closed period of benefits from July 31, 1992 through April 11, 1994. The 1993 application is not at issue here. (Tr. 356).

Judge ("ALJ"). (Tr. 49). On August 4, 2004, an evidentiary hearing was held, at which Plaintiff was represented by counsel. (Tr. 593-638). At the hearing, ALJ Deborah Smith heard testimony from Plaintiff and from an impartial vocational expert. On June 2, 2005, ALJ Smith entered her first decision denying Plaintiff's DIB application. (Tr. 353).

Plaintiff sought further review from the Appeals Council, proceeding *pro se* for a short period of time before that body.[2] (Tr. 579-583). On June 28, 2007, the Appeals Council remanded the matter to the ALJ in part because it found that Plaintiff's date last insured[3] had changed from March 31, 2004, to September 30, 2005, resulting in an unadjudicated period of time. (Tr. 368-370).

In remanding the matter back to ALJ Smith for consideration of the unadjudicated period, the Appeals Council also directed the ALJ to further evaluate Plaintiff's functional capacity and opinion evidence. (*Id.*). Specifically, the Appeals Council found:

> The decision leaves an unadjudicated period. The decision (Findings 1 and 8, and Pages 1 and 6) indicates that the claimant's date last insured is March 31, 2004, and that the claimant is not entitled to a Period of Disability or Disability Insurance Benefits prior to that date. However, an updated insured status report indicates that the claimant's date last insured is September 30, 2005.
>
> The decision indicates that the claimant has the residual functional capacity for work-related functions not involving prolonged sitting, standing and walking (Page 5), but does not express the maximum number of hours that the claimant can sit, stand, and walk. Further, the decision does not indicate the weight given to much of the opinion evidence of record. In an August 5, 2004 medical assessment, the claimant's treating physician George D.J. Griffin, III, M.D. (Exhibit B10F), was of the opinion that claimant can perform

---

[2] Plaintiff's counsel apparently briefly withdrew from representation in Plaintiff's first appeal to the Appeals Council, as Plaintiff's letter to the Appeals Council indicated that she was representing herself. However, the same attorney later resumed his representation of Plaintiff. (Tr. 15).

[3] To be entitled to disability insurance benefits, Plaintiff must establish that she was disabled prior to her date last insured. 20 C.F.R. §§404.315(a)(1), 404.320(b)(2).

> a restricted range of medium level work that involves occasional bending, twisting, turning, reaching below the knees, pushing, pulling; no climbing, crouching, kneeling, and crawling; limitations of both of hands and a restriction from heights. Jon E. Starr, M.D. and Walter A. Holbrook, M.D., State agency medical consultants, agreed that the claimant is limited to a restricted range of light work with postural limitations (Exhibit B5F). Marc W. Whitsett, M.D., was also of the opinion that the claimant is capable of performing a restricted range of light work. Further evaluation of the claimant's maximum residual functional capacity, including an evaluation of the opinion evidence, is needed.
>
> The decision does not indicate the weight given to the opinions expressed by David Chiappone, Ph.D., (Exhibit 6F) as to the claimant's ability to perform work related functions as required by 20 CFR 404.1527 and/or 416.927 and Social Security Ruling 96-5p. Dr. Chiappone reported that the claimant can understand and remember simple, one and two step job instructions. This is more limiting than the residual functional capacity found in the decision.

(Tr. 369-370).

In accordance with the remand instructions, a second evidentiary hearing was held before ALJ Smith on October 16, 2007, at which Plaintiff was represented by the same counsel. (Tr. 639-668). At the second hearing, ALJ Smith again heard testimony from Plaintiff. ALJ Smith also heard testimony from Donald Shrey, a second vocational expert. (*Id.*). On November 13, 2007, ALJ Smith entered her second decision denying Plaintiff's DIB application.

In ALJ Smith's "Findings," which represent the rationale of her second decision, she determined that Plaintiff "last met the insured status requirements of the Social Security Act on September 30, 2005," (Tr. 23), and that Plaintiff did not engage in any substantial gainful activity during the period between "her alleged onset date of July 30, 2002 through her date last insured." (Tr. 24). The ALJ additionally found that Plaintiff had the following severe impairments: "degenerative disc disease of the lumbar spine, history of right knee replacement, depression, generalized anxiety disorder, and a history of substance abuse,"

3

and that limitations from those impairments precluded Plaintiff's past relevant work. (Tr. 24, 28). However, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform simple, routine, repetitive sedentary work that allows her to alternate positions every half hour." (Tr. 26). Based upon testimony from the vocational expert, and given Plaintiff's age, education, work experience, and RFC, ALJ Smith concluded that "there were jobs that existed in significant numbers in the national economy that the claimant could have performed" through the date she was last insured. (Tr. 28). Accordingly, the ALJ determined that Plaintiff was not under disability, as defined in the Social Security Regulations, and was not entitled to DIB. (Tr. 29).

On March 13, 2010, the Appeals Council denied Plaintiff's second request for review. (Tr. 10-13). Therefore, ALJ Smith's second decision stands as the Defendant's final determination. On appeal to this Court, Plaintiff presents what are construed as three claims of error. Plaintiff argues that the non-disability determination should be reversed because: 1) the ALJ failed to consider relevant medical evidence after September 30, 2005; 2) the ALJ improperly evaluated medical opinions that were focused on Plaintiff's worker's compensation claim; and 3) the ALJ improperly assessed Plaintiff's credibility.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or

national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past

relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits. 20 C.F.R. § 404.1512(a).

**B. Specific Errors**

**1. Failure to Consider Medical Evidence after September 30, 2005**

Plaintiff first argues that the ALJ erred by rejecting all medical records relating to Plaintiff's medical care following the date she was last insured, or September 30, 2005. The ALJ explained that, with the exception of records relating to back surgery on February 10, 2005 and follow-up care through the date last insured, including an independent medical examination dated June 27, 2005, she could not relate the later-dated records back to the relevant insured time period. (Tr. 24). ALJ Smith further stated:

> The question is the claimant's functional capacity through September 30, 2005, but not thereafter. The evidence relating to the time period since September 30, 2005 shows her medical condition may have deteriorated leading to further surgeries and additional diagnoses, but the issue is the claimant's functional capacity through the date last insured, not after.

(*Id.*). Thus, on remand, the ALJ focused on the new medical evidence from the unadjudicated period - March 31, 2004 through September 30, 2005 - as well as on the medical evidence previously submitted.

The evidence clearly supports ALJ Smith's conclusion that Plaintiff's back condition did not substantially change until sometime after September 30, 2005. For example, in October 2004, Dr. Griffin noted that Plaintiff had a mild antalgic gait, but that she had "much

6

less pain" with her prescribed medication, with a "50% improvement in her pain control." (Tr. 344). He opined that Plaintiff "is currently able to work" and that she has no cognitive impairment as a result of her medication use. (*Id.*).

Although Plaintiff underwent back surgery (percutaneous lumbar disc decompression) on February 10, 2005, Dr. Griffin's reports were that Plaintiff healed "uneventfully." (Tr. 536-37). Plaintiff testified that Dr. Griffin believed she would be able to return to at least sedentary work by February of 2006, even though that did not come to pass. (Tr. 651).

Post-surgical records support the ALJ's determination that, by a month after surgery, Plaintiff "had only occasional leg pain and ambulated with a normal gait." (Tr. 27). In fact, on March 11, 2005 Plaintiff reported only "intermittent pain in her back" with a pain level at "1-2 with medication" that "varies with the weather" and was "less than before surgery." (Tr. 535). In the months following surgery, Plaintiff continued to report only intermittent or occasional back pain that she rated as manageable while on medication, from which she reported no side effects. (*See, e.g.*, Tr. 534, April 2005 report that her pain was a "0 to 4" and "not as bad as it was"; Tr. 532, May 2005 report that intermittent pain level was "0 to 3 with medication"; Tr. 530, June 2005 report that pain was not greater than a "3" on the pain scale).

In addition to Dr. Griffin's records, Dr. Gregory Fisher noted on examination in June 2005 that Plaintiff had a normal gait, normal alignment and, despite some reported back pain, showed no positive neurological findings over her lower extremities (Tr. 27, 501-502). Indeed, even though Plaintiff reported to Dr. Fisher that she continued to experience back pain, she also reported that the pain was "not as severe as it was prior to the surgery." (Tr.

7

500). On the day of her examination with Dr. Fisher, her back was "non tender and non painful" to palpation, and she reported "no pain at all over the back area but just some tightness." (Tr. 501).

Although Plaintiff reported to Dr. Griffin in July 2005 that her back pain had briefly increased, her overall pain level remained a "3" and Dr. Griffin described her functionality as "stable." (Tr. 528). Two weeks after the reported increase, on August 3, 2005, Plaintiff reported her pain level as back to a "1 to 3" level with medication. (Tr. 526). Her gait at that time was again noted as normal. (*Id*.). Even in September, the month last insured, Dr. Griffin noted Plaintiff's functioning was "stable," and Plaintiff still rated her pain on medication as a 3 out of 10. (Tr. 524).

Plaintiff did not complain of any significant increase in her pain until after the date she was last insured. On November 30, 2005, she reported a "sudden onset of severe back pain." (Tr. 520). However, in December 2005 she reported that her pain level felt "better." (Tr. 516). Even as late as August 2006, Plaintiff's pain was reported to be "relatively well controlled" by her medication. (Tr. 512).

Plaintiff now argues that the medical records after September 30, 2005 demonstrate that the 2005 surgery never resolved her back issues or ongoing issues with pain. She points specifically to records showing that she underwent thoracic surgery in April of 2007 -approximately 18 months after her date last insured. Plaintiff also relies on her continued use of narcotic pain medication for "continuing lumbar problems" throughout 2005, as well as two visits in June and August of 2005 for bilateral knee problems to argue that the ALJ should have found her complaints of disabling pain to be credible. (Tr. 512-536).

Plaintiff argues that medical records dated long after her insurance expired provide

8

support for her claim. For example, post-operative discharge notes from her April 2007 surgery reference Plaintiff's "longstanding history of back pain." (Tr. 446). A pre-operative note also describes her thoracic pain as "superimposed upon a long standing history of lower back pain from a work related fall that occurred approximately ten years ago or so." (Tr. 464). Plaintiff also points to a February 21, 2007 note by a consulting doctor (who spoke with Plaintiff by telephone), and to MRI films, to argue that her 2007 surgery on her thoracic spine reflects a pre-existing issue.

Plaintiff's interpretation of the evidence is not supported by the record. The consultant's February 2007 note refers to Plaintiff's history of low (lumbar) back pain and opines that Plaintiff's "main source of pain *now* is probably higher up." (*See* Tr. 466, emphasis added). In other words, the note does *not* relate the thoracic issue prior to Plaintiff's date last insured. Contrary to Plaintiff's post-hoc hypothesis, the medical evidence does not demonstrate - and no doctor opines - that Plaintiff's original pain continued unabated *at a disabling level*, beyond her 2005 lumbar surgery and throughout the period in which she was insured.

Plaintiff contends that the ALJ unfairly excluded the later evidence, which she sought to use to prove that a "thoracic issue" existed prior to September 30, 2005. However, the evidence does not clearly relate back to the period during which Plaintiff was insured. To the extent there is minimal evidence of a "thoracic issue" prior to the date last insured, there is no evidence that issue manifested itself in disabling pain. Instead, the record reflects that Plaintiff's back condition worsened gradually, but particularly in 2007, many months after her insured status ended.

The fact that Plaintiff "continued" to have back pain of some variety throughout her

insured period is not contrary to what the ALJ determined. The ALJ simply determined that the record evidence "shows no worsening of the claimant's impairments" or changes in the RFC determined by the ALJ through September 30, 2005, a determination that finds more than ample support in substantial evidence noted above. (Tr. 28). Many people experience chronic pain that is less than disabling. *See Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 230-231 (6th Cir. 1990)(affirming ALJ's determination that back pain from nerve root compression and herniated disc, coupled with degenerative changes, was not disabling).

Evidence generated after the date last insured is at most "minimally probative" of a claimant's condition while insured. *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Medical evidence that is generated after the relevant time period must have some demonstrated relevance, or relation back, to the disability period. "Evidence which reflected the applicant's aggravated or deteriorated condition is not relevant because such evidence does not demonstrate the point in time that the disability itself began." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988). Thus, "[r]eviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition." *Id.* (citations omitted). On the record presented, the evidence demonstrating deterioration of Plaintiff's condition long after September 30, 2005 does not undercut the substantial evidence that supports the ALJ's determination.

### 2. Medical Assessments for Worker's Compensation

In her 2007 opinion, the ALJ re-evaluated all relevant medical opinion evidence in conformity with the direction of the Appeals Council. In a second assertion of error, Plaintiff

now complains that the ALJ erred in failing to consider that the August 2004 work assessment by Dr. Griffin, (Tr. 315-318), and the March 2003 assessment by Dr. Whitsett, (Tr. 324-327), were both provided to the Ohio BWC for purposes of Plaintiff's worker's compensation claim involving her knee injuries. As such, Plaintiff argues that the forms "exclude consideration of the effect of impairments of the lumbar spine" and are only "partial evaluations." (Doc. 5 at 19).

Plaintiff's treating physician, Dr. Griffin, opined that Plaintiff could perform a limited range of medium work (Tr. 315-318). By contrast, three consulting physicians, including Dr. Whitsett, found Plaintiff capable of a limited range of light work (Tr. 220-227, 324-327). The ALJ partially relied upon the opinion of Dr. Whitsett to determine Plaintiff's RFC, but concluded that Plaintiff was limited to only sedentary work, with the ability to alternate positions every half hour (Tr. 28, 326).

Although Plaintiff now argues that the ALJ should not have relied upon assessments performed in the context of Plaintiff's worker's compensation claim, she cites no case law to suggest this was error, and this Court has discovered no such authority. *See Hoskins v. Comm'r of Social Security,* 106 Fed. Appx. 412, 2004 WL 1791477 (6th Cir. 2004)(affirming ALJ's use of physician opinions who examined plaintiff in connection with worker's compensation claim). In any event, the ALJ obviously did consider the context of Dr. Whitsett's examination, since she expressly referenced the fact that the examination "was for purposes of a workers compensation claim." (Tr. 27, citing B22F). In addition, the ALJ never represented that the opinions of Drs. Griffin and Whitsett offered a complete and total picture of Plaintiff's RFC. To the contrary, ALJ Smith determined Plaintiff's RFC as more restrictive than that determined by either Dr. Griffin or Dr. Whitsett.

It must be noted that Dr. Griffin, as Plaintiff's primary treating physician, had treated Plaintiff for years before completing his report, including for lumbar, hip, wrist, and shoulder pain. (*See, e.g.,* Tr. 136-144, 311-319, 341-50). Nowhere does Dr. Griffin state that he is limiting his review to Plaintiff's knee impairments; rather, he opined that Plaintiff had postural limitations, should only occasionally lift her above her shoulders, and that she had hand restrictions - all work-related activities that do not relate to Plaintiff's knee injuries. Similarly, although Dr. Whitsett's opinion focuses on Plaintiff's knee impairments, he also reviewed and commented on Plaintiff's complaints concerning her spine. (*See* Tr. 326, noting that Plaintiff "does have complaints to the lumbar area" but that "this does not contribute to the claimant's disability.").

Plaintiff says she does not "oppose consideration" of the reports of Drs. Griffin, Whitsett, and a briefly referenced third consultant (Dr. Fisher),[4] but only claims error on the failure of the ALJ to express "awareness that the limitations specified therein arose solely from the allowed conditions of the claim and they were not general medical evaluations." (Doc.12 at 8).

As stated, the ALJ already showed such "awareness" by expressly referencing the purpose of Dr. Whitsett's assessment. Moreover, this Court finds no error in the ALJ's failure to reference that the assessments of Drs. Fisher and Griffin were also performed in the context of Plaintiff's worker's compensation claim. Viewing the record as a whole, and considering that the ALJ determined Plaintiff to have greater restrictions than those found by any of the three referenced physicians, it is unclear what additional purpose that more

---

[4] In his June 27, 2005 assessment (after the assessments of Drs. Griffin and Whitsett), Dr. Fisher agreed that the aggravation of Plaintiff's lumbar spine condition could not be related back to a 1992 work injury involving Plaintiff's knees. (Tr. 503).

expressed "awareness" could have served. Certainly, the ALJ had no legal obligation to limit use of the assessments.

### 3. Plaintiff's Credibility

The last error asserted by Plaintiff is that the ALJ improperly assessed her to be not fully credible. Plaintiff testified that she could not work for more than 3-4 hours at a time, and could not work consecutive days. If the ALJ had determined that Plaintiff was fully credible, her testimony concerning her inability to work consecutive days would have rendered her disabled. (Tr. 655-657, 662-663).

A disability claim can be supported by a claimant's subjective complaints, as long as there is objective medical evidence of the underlying medical condition in the record. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476. (citations omitted). An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

Plaintiff first argues that the ALJ erred in finding substance abuse to be an issue

during the period she remained as insured, citing some evidence that it was less of an issue in 2007. In her 2007 opinion, the ALJ wrote:

> [T]he evidence shows that [alcohol abuse] was an issue prior to the date last insured. In August 2004, Dr. D'Souza diagnoses substance abuse--alcohol. He does not state it is in remission at that time. (Exhibit B16F/2). In May 2003, the State Agency physicians who reviewed the medical evidence of record discuss alcohol abuse..., noting references in records in July 1999. (Exhibit B9F) and March 2003. (Exhibit B6F). The evidence submitted on remand shows that it may not be a problem in the last 2 years, but it was during the time period in question through September 30, 2005, the date last insured.

(Tr. 24). In the same opinion, ALJ Smith further explained that the issue was irrelevant to the extent that the ALJ never concluded that alcohol affected Plaintiff's ability to work. Although the ALJ found Plaintiff's alcohol abuse to be severe, she also found that the alcohol use was not material to any finding of disability, but rather, was relevant only as a credibility and noncompliance issue. (Tr. 25).

Plaintiff argues that it was improper for the ALJ to rely upon Dr. D'Souza's 2004 report as evidence of a substance abuse issue, when the ALJ discredited Dr. D'Souza in most other respects. However, the ALJ's consideration of Dr. D'Souza's opinions, which she gave little weight overall, was reasonable. Dr. D'Souza's opinion concerning Plaintiff's alcohol abuse was consistent with other evidence noted in the record. In contrast, his opinion that Plaintiff's mental functioning was severely limited was not supported by clinical notes or other medical evidence, and was inconsistent with Plaintiff's own reports of her daily activities.

Plaintiff next complains that the ALJ's credibility findings should be thrown out because the ALJ resorted to "boilerplate" language in her conclusion that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms

remain not fully credible." *See Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010)(Judge Posner's comments abhorring the use of virtually the same "meaningless boilerplate" in describing a claimant's statements as "not entirely credible.").

In addition to the referenced "boilerplate" language, however, ALJ Smith expressly incorporated into her 2007 opinion the detailed credibility determination she made in her 2005 opinion. That lengthy credibility discussion is set out in full for context and completeness of this record:

> Concerning the claimant's credibility, the claimant was clearly withholding information during her hearing testimony regarding the extent of her alcohol use. For example, she told Dr. Chiappone that she had consumed six beers the night before his examination, and that she usually has three to six beers every other day. She also acknowledged that other people had complained to her about her use of alcohol, and that she had been smoking marijuana for the past three years. At the hearing, the claimant stated that she had had a few beers the day before the hearing, and acknowledged that she drinks a few times a week. During the earlier consultative psychological evaluation, the claimant was vague about her current alcohol use, although she admitted to using alcohol heavily in the past. ...The reviewing psychologist on behalf of the State Agency in May 2003 was also concerned about the claimant's history of alcohol consumption....
>
> Thus, the record suggests that the claimant has had ongoing use of alcohol even while taking narcotic medication. Moreover, there are insufficient treatment records from Dr. D'Souza to reflect how much the claimant currently drinks, and the overall record suggests that the claimant's continued use is reflective of noncompliance. She is clearly in denial about her continuing alcohol use and/or use of marijuana. This detracts significantly from the claimant's overall credibility as a witness.
>
> Also detracting from the claimant's overall credibility, is the fact that she apparently over reported various aspects of her mental difficulties during the completion of an MMPI....In fact, the treating physician for the claimant's bilateral knee and lumbar pain, George Griffin III, M.D., has consistently reported that the claimant has good cognitive ability despite the fact that she is on various types of narcotic pain medication (Exhibits B10F, B17F).
>
> Significantly, in August 2003, a counselor with Cincinnati Counseling Services, Inc., Diane Zieger, M.Ed., reported that session notes indicated

> that the claimant had been released to work by her physician. It was Ms. Zieger's understanding that the claimant had been working at a department store, and had also been working at Bingo weekly with her father (Exhibit B13F).
>
> The portions of the treatment record cited above are consistent with the fact that the claimant is currently involved in part-time work, and has a much higher level of functioning than she indicated in her hearing testimony. Notably, she informed Dr. Chiappone in March 2003 that she is able to do some cooking and some laundry, although she chooses to let her husband do most of the household chores. The claimant also acknowledged knowing how to grocery shop and stated that she enjoys reading and watching television. She reported being able to keep up with various medical appointments and physical therapy sessions on a weekly basis (Exhibit B6F, p. 3). In documents submitted in conjunction with her application for benefits, the claimant has acknowledged that she does some driving and is able to shop for Christmas presents and for personal items with the help of her sister (Exhibit B1E, p. 4).
>
> [T]he claimant's attorney has ...set forth the argument that the claimant, despite her ongoing physical and psychological difficulties, has continued working as much as she possibly can (Exhibit B13E). However, this argument is predicated on finding that the claimant is a credible witness, and for the various reasons stated above it is found that the claimant was not wholly credible. Instead, her testimony can only be credited to the extent that it was consistent with the residual functional capacity assessment set forth below.....
> ....
> Despite the claimant's lack of credibility, she is given the benefit of the doubt with respect to her difficulty with prolonged sitting, standing, and walking as of the alleged onset date, and continuing until the date that she was last insured.....

(Tr. 359-360).

Plaintiff complains that the ALJ should not have discredited her based upon the fact that she drinks alcohol; otherwise "much of the populace would be incredible in what they say." (Doc. 5 at 24). Plaintiff asserts that the ALJ's opinion evidences an "inappropriate focus on beer drinking and innuendo about other substance issues." Additionally, Plaintiff argues that the ALJ used improper "innuendo and suggestion" to conclude that Plaintiff was

16

drinking more than she admitted. Plaintiff notes that she "freely admitted consuming alcohol" including "several" beers the day before the hearing. (Doc. 5 at 24).

The ALJ's conclusion that Plaintiff under reported or minimized her alcohol use was not error. Plaintiff admitted at the hearing that she drank every other day. (Tr. 620-621). She somewhat grudgingly conceded that her therapist told her she had a drinking problem, but also defensively testified that "I think almost everybody has an alcohol problem." (*Id.*). Dr. Farrell noted alcohol abuse in 1999 (Tr. 299-301) and Plaintiff admitted to consulting examiner Dr. Chiappone in 2003 that she had blackouts and that others had complained about her alcohol use. (Tr. 230). Plaintiff stated that she had been advised not to drink due to her prescription narcotic use, but chose to drink anyway, explaining: "I just got to be careful." (Tr. 621). In short, the records support the ALJ's credibility assessment regarding the issue of Plaintiff's substance abuse.

Of course, Plaintiff's testimony concerning her alcohol use was not the only issue impacting her credibility. As found by the ALJ, Plaintiff's testimony was often in contradiction of the records, in terms of over-reporting symptoms. At the second hearing, Plaintiff "testified that the surgery in February 2005 was no real help, but the treating records show that her pain was improved through the time period in question and that she had no abnormal neurological findings in June 2005." (Tr. 27). As discussed above, multiple medical records reflect Plaintiff's contemporaneous reports to her physicians that her condition improved after her 2005 back surgery, and worsened again only after the date she was last insured. The ALJ also appropriately considered Plaintiff's daily activities, including playing with her dogs, taking vacations, doing cooking and laundry, and shopping. *See e.g.*, SSR 96-7p, 1996 WL 374186 at *3; (*See also* Tr. 230, Plaintiff's report that she

enjoys getting together with friends twice a week to go to the bar or play cards).

Plaintiff suggests that the ALJ's consideration of Plaintiff's part-time employment in the context of evaluating her credibility is inappropriate and reflects only "suspicion and hostility."  However, in the context of the record as a whole, Plaintiff's ability to engage in part-time work through November 2004 may be considered to evaluate Plaintiff's credibility, just as other activities are considered under Social Security Rules.  *See* SSR 96-7p.  In addition, as the ALJ noted, nearly every doctor - including Dr. Griffin - Plaintiff's long-time treating physician - agreed that Plaintiff was not as limited before her date last insured as she claimed to be (Tr. 27-28, 358, 360).

As a last critique buried within the discussion of credibility issues, Plaintiff includes the singular question (without discussion or argument): "Whatever happened to bipolar between the hearings?"  In her reply memorandum, Plaintiff adds minimally to her argument by noting that although the ALJ endorsed bipolar disorder as the source of "definite and measurable work limitations," ALJ Smith failed to specifically list the disorder among Plaintiff's "severe" impairments.

Given the lack of any explanation as to how further consideration of Plaintiff's alleged bipolar disorder would have impacted the disability determination, this throw-away "argument" should be deemed waived.  *See U.S. v. Demjanjuk,* 367 F.3d 623, 638 (6th Cir. 2004).  To the extent the argument is not deemed waived, the record does not support any additional limitations based upon a diagnosis of bipolar disorder.  A diagnosis, in and of itself, is not conclusive evidence of disability because it does not reflect the limitations, if any, that it may impose upon an individual.  *See Young v. Secretary of Health and Human Services*, 925 F.2d 146, 151 (6th Cir. 1990).

Drawing inferences in Plaintiff's favor, this Court could construe her argument as one advocating for the adaption of Dr. D'Souza's most restrictive limitations, to the extent that Dr. D'Souza references Plaintiff's bipolar diagnosis. In her reply memorandum, Plaintiff for the first time suggests that the ALJ erred by discrediting Dr. D'Souza's opinions based upon the lack of supporting records, complaining that the regulations "do not list production of treatment notes as criteria for acceptance of a medical opinion from a treating physician." However, 20 C.F.R. §404.1527(d)(2) provides that a treating physician's opinions are entitled to "controlling weight" only to the extent that they are *"well-supported by medically acceptable clinical and laboratory diagnostic techniques and...not inconsistent with the other substantial evidence in your case record*." *Id.* (emphasis added). *See also Warner v. Comm'r of Soc. Sec.,* 375 F.3d at 390. The absence of any treatment notes or clinical records to support Dr. D'Souza's highly conclusory opinions, which were inconsistent with other substantial evidence, was a proper basis on which to discredit those opinions.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**, and that this case be **CLOSED**.

 */s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

KATHY L. BERRY,

       Plaintiff,

v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

Case No. 1:10-cv-435

Spiegel, J.
Bowman, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).